United States District Court
Southern District of Texas
**ENTERED**
July 31, 2018
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ZULEMA LONGORIA, | § | |
| as next friend of M.L., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:17-cv-160 |
| | § | |
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT | § | |
| SCHOOL DISTRICT, et al., | § | |
| Defendants. | § | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The Court is in receipt of Defendants' "Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim and Assertion of Qualified Immunity (Defendants' "Motion" or "Rule 12(b)(6) Motion to Dismiss"), and Defendants' "Motion to Dismiss for Lack of Subject Matter Jurisdiction Due to Mootness" (Defendants' "Rule 12(b)(1) Motion to Dismiss"). Dkt. Nos. 11, 33. It is recommended that Defendants' Rule 12(b)(1) Motion to Dismiss be **DENIED** and Defendants' Rule 12(b)(6) Motion to Dismiss be **GRANTED**.

## I.    Background and Procedural History

M.L. is a student at San Benito High School, a part of the San Benito Consolidated Independent School District ("SBCISD") in San Benito, Texas.[1] Dkt. 1 at 2-3.  In March 2017, M.L. was selected to be the head varsity cheerleader of the

---

[1] All well-pleaded facts alleged by the non-movant are taken as true for purposes of a Rule 12(b)(6) motion. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

San Benito High School Cheerleading Squad for the 2017-2018 school year.  *Id.* at 4.
However, on March 20, 2017, M.L. and her mother, Plaintiff Zulema Longoria, were
called to a meeting with the San Benito High School cheerleading coaches,
Defendants Ashley Camacho-Garza and Velma Garcia.  Plaintiff alleges that she
and M.L. were given a letter "dismissing . . . M.L. from the cheerleading squad for
inappropriate postings on social media."  *Id.* at 5.  Specifically, the letter stated that
M.L. was dismissed for accumulating a number of demerits after she "made 10 posts
to her social media with inappropriate material."  Dkt. No. 1-2.

Plaintiff and M.L. filed a "Level 1 grievance" to appeal the decision to the
school principal, Defendant Henry Sanchez.  Dkt. No. 1 at 5.  Plaintiff's grievance
contended that M.L. had entered "likes" to eight of the ten social media posts cited
by the coaches, but did not post any of them herself.  *Id.*  Further, Plaintiff asserted
that the San Benito Cheerleading Constitution (the "Cheerleading Constitution")—
the set of policies under which M.L. had been dismissed—did not elaborate on what
constituted "inappropriate material," and M.L. had no notice that her social media
"likes" could be scrutinized by the coaches.  *Id.* at 6.  Plaintiff argued that the
dismissal violated M.L.'s "Right of Free Speech."  *Id.*

Sanchez held a "Level 1 hearing" on April 12, 2017.  Dkt. No. 1 at 6.  On April
28, 2017, Sanchez issued a written "ruling" which upheld M.L.'s dismissal from the
team and found that her First Amendment rights were not violated.  *Id.* Plaintiff
and her counsel met with the school district's superintendent, Defendant Dr. Adrian
Vega, and were informed thereafter that the decision to dismiss M.L. from the

cheerleading team had been "final." *Id.* Plaintiff did not pursue further administrative remedies, as she alleges that, under the district's policies, rulings of the principal regarding the enforcement of extracurricular activity constitutions are final and cannot be appealed. *Id.* at 7.

Plaintiff filed suit against Defendants on August 15, 2017. Dkt. No. 1. Defendants submitted the instant Motion pursuant to Federal Rule of Civil Procedure 12(b)(6) on September 12, 2017. Dkt. No. 11. Plaintiff responded on October 25, 2017. Dkt. No. 15. Defendants replied on November 6, 2017. Dkt. No. 16. The Court issued a protective order and stay on discovery on November 13, 2017. Dkt. No. 18. The Court issued a Report and Recommendation ("First R&R") on December 22, 2017, and amended the same on December 27, 2017. Dkt. Nos. 22, 28. The First R&R stated that a Rule 7(a) reply providing greater factual detail was needed prior to disposition of Defendants' qualified immunity defense. *Id.* Specifically, the record before the Court lacked facts describing the content of the social media posts at issue. *Id.*

Plaintiff filed her Rule 7(a) reply on December 27, 2017. Dkt. Nos. 26, 27. Defendants responded to the reply on January 10, 2018. Dkt. No. 29. Based on the additional filings now made part of the record, the Court withdrew the First R&R on February 26, 2018. Dkt. No. 32. Defendants filed a second motion to dismiss on July 10, 2018, asserting the Court lacked subject matter jurisdiction over the case. Dkt. No. 33. Plaintiff filed an advisory on July 13, 2018, and a response on July 20, 2018. Dkt. Nos. 35, 36. Defendants replied on July 27, 2018. Dkt. No. 37.

## II.     Legal Standards

### A. Federal Rule of Civil Procedure 12(b)(1)

A party may move for a court to dismiss a plaintiff's cause of action on the basis that the court lacks subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1). Unlike motions to dismiss under Rule 12(b)(6), where the plaintiff's allegations are taken as true and viewed under the most favorable light, the plaintiff bears the burden of proof that jurisdiction exists under Rule 12(b)(1).  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."); *Ambraco Inc. v. Bossclip B V*, 570 F.3d 233, 238 (5th Cir. 2009).  Courts must consider a jurisdictional attack under Rule 12(b)(1) prior to considering other grounds for dismissal.  *Ramming*, 281 F.3d at 161 (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.")).   In considering whether it has subject matter jurisdiction, a court may consider matters of fact that are either in dispute or outside the pleadings.  *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986); *Ambraco*, 570 F.3d at 238 (noting that both 12(b)(1) and (b)(3) allow courts to look past the pleadings to resolve disputed facts).  "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."  *Ramming*, 281 F.3d at 161.  "A case is properly

dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).

### B. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) provides for dismissal of a cause of action based on the plaintiff's failure to state a claim upon which relief could be granted.  FED. R. CIV. P. 12(b)(6).  The burden is on the movant to show that the plaintiff has failed to state a legally cognizable claim.  *Construction Cost Data, LLC v. Gordian Group, Inc.*, No. 4:16-CV-114, 2017 WL 2266993, at *3 (S.D. Tex. Apr. 24, 2017), *adopted* 2017 WL 2271491 (S.D. Tex. May 22, 2017).  "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

"Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief."  *Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir. 2008).  All well-pleaded facts will be taken as true and viewed in the light most favorable to the plaintiff.  *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).  But any allegations in the complaint which are conclusory will not be afforded a presumption of truth.  *Johnson v. E. Baton Rouge Fed'n of Teachers*, No. 17-30175, 2017 WL 3772887, at *2 (5th Cir. Aug. 30, 2017) (per

curiam).  Therefore, a complaint must contain sufficient factual matter that states a claim to relief that is "'plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Legal conclusions that are "naked assertions devoid of further factual enhancement" or mere "formulaic recitation of [a claim's] elements" are not enough.  *Id.*  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Turner v. Lieutenant Driver*, 848 F.3d 678, 684-685 (5th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555-56 (citations omitted).

### C. Qualified Immunity

Qualified immunity "shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alterations in original).  This immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "At the motion-to-dismiss stage, 'a plaintiff seeking to overcome

qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity.'" *Craig v. City of Fort Worth*, No. 4:17-CV-1020-A, 2018 WL 2271011, at *4 (N.D. Tex. May 17, 2018) (citing *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)).  The plaintiff need not "present absolute proof" to defeat an assertion of qualified immunity, "but must offer more than mere allegations."  *Id.* (quoting *King*, 821 F.3d at 652).

"In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987).  Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011).  "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"  *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

### III.   Discussion

"To state a claim under § 1983, a plaintiff must (1) allege a violation of rights

secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).  Plaintiff alleges that state actors violated M.L.'s rights under the First, Fifth, and Fourteenth Amendments.  Dkt. No. 1.  Defendants assert that Plaintiff's claims are moot, that Plaintiff fails to plead facts to state a claim for any constitutional violation, and that the individual Defendants are entitled to qualified immunity.  Dkt. No. 11.

### A. Subject Matter Jurisdiction

"When a Rule 12(b)(1) motion is filed in conjunction with a Rule 12(b)(6) motion . . . courts must consider the jurisdictional challenge first." *McCasland v. City of Castroville*, 478 Fed. Appx. 860, 860 (5th Cir. 2012) (per curiam).  In their Rule 12(b)(1) motion, Defendants state that "M.L. has recently received her requested relief, as she has tried out for and been returned to the varsity cheerleading squad."  Dkt. No. 33 at 4.  Therefore, Defendants claim, "there are no longer adverse parties with sufficient legal interests to maintain the litigation, and this case should be dismissed due to mootness."  *Id.*  Plaintiff has advised the Court that she still wishes to proceed with her case, and maintains that her case is not moot because she is seeking damages.  Dkt. Nos. 35, 36.

"A claim is moot when a case or controversy no longer exists between the parties." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 345 (5th Cir. 2017). "The mootness doctrine applies to equitable relief but will not bar any claim for damages, including nominal damages." *Id.*  Plaintiff's complaint did not limit her

relief sought to a position on the cheerleading squad. She also seeks appropriate compensatory damages in an amount to be determined at trial. Dkt. No. 1 at 8. Defendant acknowledges as much. Dkt. No. 33 at 6. Plaintiff's complaint alleged loss in the form of "potential for scholarships, training and travel" as a result of being dismissed from the team. Dkt. No. 1 at 8. None of these claimed past damages would per se be rectified by restoration to the team. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 397 (2007) (reviewing student speech case and claim for damages long after student had graduated). The Fifth Circuit has consistently held that a claim for even nominal damages will avoid mootness. *See Ward v. Santa Fe Ind. Sch. Dist.*, 35 Fed. Appx. 386 (5th Cir. 2002) (per curiam) ("[A]uthority supports the proposition that, whether or not a plaintiff's request for injunctive relief has become moot, a suit should not be dismissed in its entirety so long as the plaintiff has alleged a cognizable claim for nominal damages for the constitutional violation he suffered."). While M.L.'s return to the team could impact portions of her requested relief, the case as a whole should not be dismissed for mootness. Defendants' Rule 12(b)(1) Motion should be **DENIED**.

## B. First Amendment Claims

The First Amendment precludes the government from abridging the freedom of speech. U.S. CONST. amend. I. "[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)).

Of course, "constitutional protection is not absolute, especially in the public school setting," where "[e]ducators have an essential role in regulating school affairs and establishing appropriate standards of conduct." *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 442 (5th Cir. 2001).

In the seminal case on student speech, *Tinker v. Des Moines Independent Community School District*, public school students brought a § 1983 claim against a school district after they were suspended for wearing black armbands to school in opposition to the Vietnam War. 393 U.S. 503 (1969). The Supreme Court held that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students," creating the mantra that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. However, these rights have to be balanced with "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in schools." *Id.* at 507. Under the *Tinker* standard, therefore, school officials may take an adverse action against student speech where facts might reasonably lead them to "forecast substantial disruption of or material interference with school activities," or where the speech at issue would "impinge upon the rights of other students." *Id.* at 509, 514. "[C]onduct by the student, in class or out of it, which for any reasons—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves a substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee

of freedom of speech." *Id.* at 513 (citing *Blackwell v. Issaquena Cty. Bd. of Edu.*, 363 F.2d 749 (5th Cir. 1966)).

Since *Tinker*, the Supreme Court has revisited student speech three times, with each decision identifying a different category of speech for which students may be disciplined even without a substantial disruption. In addition to the standards set out in *Tinker*, students may be disciplined when they are engaged in lewd speech (*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)), when they are participating in school-sponsored speech (*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)), and when they are promoting illegal drug usage (*Morse v. Frederick*, 551 U.S. 393 (2007)). These three categories are "narrow exceptions to the general *Tinker* standard." *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 390 (5th Cir. 2015). The Supreme Court has never addressed whether school officials may take adverse action against a student for speech disseminated on the Internet.

However, the Fifth Circuit recently addressed a student's off-campus, online speech rights for the first time in *Bell v. Itawamba County School Board*, 799 F.3d 379 (en banc) (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1166 (2016). High school student Taylor Bell posted a recording to his Facebook profile in which he rapped about alleged sexual misconduct by coaches at his school. *Id.* at 383-85. School officials suspended Bell, citing the recording's violent lyrics, and Bell filed suit for a violation of his First Amendment rights. *Id.* at 386. The Fifth Circuit held that *Tinker* governed Bell's speech, and that *Tinker* applies "when a student intentionally directs at the school community speech reasonably understood by

school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources." *Id.* at 396. Thus, "as a matter of law . . . a school official reasonably could find Bell's rap recording threatened, harassed, and intimidated the two teachers; and a substantial disruption reasonably could have been forecast[.]" *Id.* at 391. This emphasis on the nature of the lyrics tracked earlier Fifth Circuit precedent recognizing that off-campus student speech threatening school violence is not protected by the First Amendment. *Ponco v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007). The Fifth Circuit declined to adopt or reject approaches delineating the boundaries of when school officials may respond to off-campus speech, holding only that, under the specific facts, *Tinker* allowed for Bell's speech to be disciplined by school officials. *Id.* at 396.

### 1. Claims against individual defendants: qualified immunity

An assertion of qualified immunity implicates a two-pronged analysis: (1) whether a government actor violated the plaintiff's constitutional rights, and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts were previously required to address both prongs of the analysis, in this order. *Id.* With its decision in *Pearson v. Callahan*, however, the Supreme Court abolished this "rigid order of battle," and granted lower courts the discretion to begin with either prong. 555 U.S. 223, 234 (2009). "In general, courts should think hard, and then think hard again" about the need to address the first prong where the case may be decided on the second. *Camreta v. Greene*, 563 U.S. 692, 707

(2011). Yet "it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Id.* In those circumstances, *Pearson*'s "flexibility properly reflects [the Supreme Court's] respect for the lower federal courts that bear the brunt of adjudicating these cases." *Pearson,* 555 U.S. at 242. "For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong." *Id.* "[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Id.* (citation omitted). Importantly, "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.*

There are certain delineated situations under which courts should abstain from evaluating both prongs of qualified immunity. The Supreme Court listed these situations as (1) "cases in which the constitutional question is so factbound that the decision provides little guidance for future cases," (2) where "the question will soon be decided by a higher court," (3) where the constitutional decision would rest "on an uncertain interpretation of state law," (4) where qualified immunity is asserted at the pleading stage *and* "the precise factual basis for the plaintiff's claim or claims may be hard to identify," and (5) where "the briefing of constitutional questions is woefully inadequate." *Pearson*, 555 U.S. at 237-243. In these circumstances,

"courts should address only the immunity question." *Camreta*, 563 U.S. at 707.

The Court does not find any of these circumstances to be present here. While qualified immunity was asserted at the pleading stage in this case, the precise factual basis for Plaintiff's claims is no longer hard to identify, given Plaintiff's submission of the social media postings at issue. Addressing the first prong and discussing the means by which plaintiffs may state a claim would aid in the Court's determination of whether the rights were clearly established. Therefore, the Court, having "thought carefully" about the factors deemed relevant by the Supreme Court, opts to exercise its discretion to analyze both prongs of the qualified immunity test. *See, e.g.*, *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (finding student did state a claim for a First Amendment violation, but determining the right at issue was not clearly established); *see also Lathan v. Stevens*, No. 2:16–CV–147, 2017 WL 7038195, at *6 (S.D. Tex. Aug. 7, 2017), *adopted by*, 2018 WL 497125 (S.D. Tex. Jan. 19, 2018) ("[I]t will *often be appropriate* to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established[.]") (emphasis added).

### a. Constitutional violation

"It is axiomatic that 'the First Amendment prohibits . . . adverse government action against an individual because of her exercise of First Amendment freedoms." *Jackson v. Ladner*, 626 Fed. Appx. 80, 88 (5th Cir. 2015) (per curiam) (quoting *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)). To state a claim for a First

Amendment violation, a student must plead facts to show she was deprived of a "legally protected interest," such as the right to free speech without repercussions from government. *Madrid v. Anthony*, 510 F. Supp. 2d 425, 433-34 (S.D. Tex. 2007). Once a student has pleaded that she was engaged in speech, courts must categorize the type of speech by its content—if punishable, the speech will either fall into one of the three exceptions to *Tinker*'s disruption standard, or be governed by *Tinker*. *Bell*, 799 F.3d at 391.

"In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Tinker*, 393 U.S. at 510. Thus, "[w]hen the constitutionality of a school regulation is questioned, it is settled law that the burden of justifying the regulation falls upon the school board." *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 969 (5th Cir. 1972). The Fifth Circuit has offered a rationale for this placement of the burden: "[f]irst, since it is the school board that asserts the right to curtail presumptively protected activity, the board should bear the burden of establishing why; and second, the school board presumably has the essential information that led it to conclude that the activity had to be curtailed." *Id.* at 970 n.7. Reaffirming the placement of this burden, the Fifth Circuit has since noted that "school officials must offer facts to support their proscription of student speech," though this is not a "difficult burden." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221 (5th Cir. 2009) (citations omitted); *see also Madrid*, 510 F. Supp. 2d at 435 ("The Court must determine whether C-FISD demonstrated that it lawfully precluded students from

wearing the t-shirts at school[.]").  That this burden rests with state actors aligns with more general First Amendment principles.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Here, Plaintiff alleges that M.L. exercised her First Amendment right to free speech by publishing and "liking" posts on social media, and that she suffered an adverse government action through her removal from an extracurricular activity because Defendants deemed the content of her expression to be "inappropriate" under the Cheerleading Constitution.  Plaintiff alleges that the speech was non-threatening, and undirected toward the school environment.  Defendants argue that Plaintiff failed to plead facts showing M.L. was engaged in protected expression or that she was deprived of a constitutionally cognizable interest.

As a threshold matter, the Court must consider whether M.L. was engaged in speech at all.  Plaintiff urges the Court to determine that a social media "like" is both substantive expression as well as a form of symbolic speech.  Dkt. No. 15 at 3. Defendants note the lack of binding precedent that "likes" may constitute speech, but do not provide argument as to *why* social media "likes" should be excluded from the realm of speech.  Dkt. No. 11 at 5.

Online speech is protected by the First Amendment.  *Jackson*, 626 Fed. Appx. at 88 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 672-73 (2004)).  On Twitter, "[i]ndividuals can post or tweet their own messages on their own wall or they can 'interact with other people's tweets by either commenting on them, re-tweeting

them, which is sharing, liking them, or direct messaging users.'" *Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1006 (E.D. Ky. 2018). No court in the Southern District of Texas or Fifth Circuit has had occasion to determine whether a social media "like" qualifies as a form of speech. However, at least two other federal courts have answered this question in the affirmative. In *Bland v. Roberts*, the Fourth Circuit reversed a district court's decision that Facebook "likes" were not protected speech. 730 F. 3d 368, 394 (4th Cir. 2013). The court recognized the police officer plaintiffs' "likes" of a political candidate's Facebook page to be both pure speech and symbolic expression. *Id.* at 386. For example, to "like" a political candidate's campaign page "communicates the user's approval of the candidate and supports the campaign by associating the user with it." *Id.* Similarly, outside of the Fourth Circuit, a separate court agreed that a Facebook "like" both generates pure speech and qualifies as symbolic expression. *Vincent v. Story Cty.*, No. 4:12-CV-00157-RAW, 2014 WL 10007079 (S.D. Iowa Jan. 14, 2014).

The Court agrees that a social media "like" may qualify as a form of pure speech. "On the most basic level, clicking on the 'like' button literally causes to be published the statement that the User 'likes' something, which is itself a substantive statement." *Bland*, 730 F.3d at 386. The Fourth Circuit stated:

> "Liking" on Facebook is a way for Facebook users to share information with each other. The "like" button, which is represented by a thumbs-up icon, and the word "like" appear next to different types of Facebook content. Liking something on Facebook "is an easy way to let someone know that you enjoy it[.]"

*Id.* at 385. Pure speech need not be accompanied by any particularized message.

*Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 296 (5th Cir. 2001).  Here, M.L.'s "likes" in themselves generated pure speech by sharing a substantive statement with M.L.'s social media feed and friends that she "liked" eight posts. Defendants apparently saw no distinction between a social media post and a social media "like," given that their dismissal letter to M.L. states: "[M.L.] has *made 10 posts* to her social media with inappropriate material."  Dkt. No. 1-2 (emphasis added).  Defendants' own language underscores the reality that, often, a "like" may send a message just as capably as a social media post.  Therefore, the Court cannot conclude, at the 12(b)(6) stage, that M.L.'s social media "likes" would fail to qualify as a form of speech merely by their novel mode of dissemination.[2]

Next, the Court turns to categorizing the content of the speech, and to Defendants' assertion that M.L.'s speech is categorically unprotected by the First Amendment.  If M.L.'s speech does not fall into one of the three exceptions carved out by the Supreme Court—*Fraser*, *Hazelwood* and *Morse*—it would be governed by the more general *Tinker* standard, and the speech is presumed protected absent facts to show the officials could reasonably forecast a substantial disruption.  *Bell*, 799 F.3d at 391.   According to Defendants' Motion, "the Supreme Court's jurisprudence makes clear that forms of speech which include those that are lewd, vulgar, profane, obscene, libelous, fighting words, and indecent are not protected by the First Amendment[,]" and "Plaintiff has failed to allege any well-pleaded facts

---

[2] Because M.L. engaged in pure speech, the Court need not apply the symbolic speech test proffered by Defendants to determine whether M.L.'s expression showed intent to convey a particularized message, or whether that message was greatly likely to be understood by those who viewed it.

showing that the social media postings she 'liked' were not within these categories of speech excluded from First Amendment protection." Dkt. No. 11 at 3.

Plaintiff submitted the social media postings forming the basis of her pleadings under seal along with her Rule 7(a) reply.[3]  Dkt. No. 27.  The Tweets shown to have been "liked" by M.L. include: (1) "Imma show my mom all the snaps from girls partying for spring break so she can appreciate her lame ass daughter some more," (2) a reference to braiding hair punctuated with the acronym "lmao," (3) a text conversation, apparently between a mother and a daughter, in which an expletive is used twice, (4) a musing about happiness, posted by an account called "Bitch Code," (5) "I love kissing lmao," (6) "i don't [expletive] with people who lowkey try to compete with/ out do me," (7) "So let's set this [expletive] straight I got zero hoes zero guys zero ppl entertaining me :-) k bye," (8) "I [expletive] love texas man, it's so beautiful and just overall great! Why would anyone want to leave Texas :/," (9) "I love her @[Twitter account name] I [expletive] love you so much and you don't even know it like bitch I hope you do great [expletive] in life I believe in you," (10) a collage of grainy, unclear photos and caption "bitch don't touch my . . .," posted by an account called "Horny Facts." Dkt. No. 27.[4]  The filing also included a post by M.L. in which she Tweeted, "Yes," in response to the question: "Did pope split you in half??"  Following this is an exchange in which another individual asks

---

[3] Conversion of Defendants' Motion to a motion for summary judgment is unnecessary for consideration of this filing.  The social media posts are referenced in Plaintiff's complaint and central to her First Amendment claim.  *See, e.g.*, *AXA Art Americas Corp. v. Pub. Storage*, 208 F. Supp. 3d 820, 825 (S.D. Tex. 2016).

[4] The Court has redacted certain expletives and the Twitter account name of a third-party student. The original renditions of these Tweets are available under seal at Dkt. No. 27.

"HOW are you still alive," to which M.L. replies, "I have no idea," and a third poster

responds, "[expletive] I hate twitter bro."  Plaintiff has attached an explanatory

entry from a website called "Urban Dictionary" suggesting that this post was a form

of sexual innuendo.  Dkt. No. 27-3 at 1, 4.

Plaintiff alleges that her expression was pure speech "of matters of personal

concern and in a forum amongst friends."  Dkt. No. 15 at 5-6.  She states:

> The content "liked" by M.L. was crude humor and at best in poor
> taste.  Objectively the content did not provide a serious tone and took
> the form of gossip if viewed by bystanders.  The content was of no
> consequence and could hardly be interpreted to stir the speaker to take
> action.   The content had absolutely no relationship to the school
> mission or pedagogical goals.  The content was disseminated amongst
> a friend group within her social media page and was meant to remain
> private within her friend group.  No educator or student by name was
> referenced.  M.L., had no past incidents arising out of similar speech.
> The manner by which the speech reached the school community was
> not by M.L. but rather by parents of other cheerleaders with
> questionable motives.
> The truth is that Defendants Sanchez, Camacho-Garza and
> Sanchez allowed their subjective opinion to get the better of them in
> light of fair notice that this type of off-campus speech did not create a
> substantial disturbance in-fact or could reasonably have been foreseen
> to create such a disturbance for the school district.

Dkt. No. 26 at 8-9.

Defendants contend that the postings are "lewd" speech punishable under the

Supreme Court's holding in *Fraser*.  Dkt. No. 29 at 3.  In that case, high school

student Matthew Fraser was suspended after delivering a "sexually explicit

monologue directed towards an unsuspecting audience of teenage students" at a

school assembly.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986).  The

Supreme Court held that "[t]he First Amendment does not prevent the school

officials from determining that to permit a vulgar and lewd such as respondent's would undermine the school's basic educational mission." *Id.* Rather, "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Id.* The Supreme Court's rationale was that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.*

Defendants' lewd speech argument fails because the scope of *Fraser* has been limited by the Supreme Court to the school context. "Had Fraser delivered the same speech in a public forum *outside the school context*, it would have been protected." *Morse v. Frederick*, 551 U.S. 393, 394 (2007) (citing *Fraser*, 478 U.S. at 682-683) (emphasis added); *see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 932 (3d Cir. 2011) ("*Fraser*'s 'lewdness' standard cannot be extended to justify a school's punishment of J.S. for use of profane language outside the school, during non-school hours."). Off-campus expression implicates separate concerns from the *Fraser* holding's premise that "[a] high school *assembly or classroom* is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students." *Fraser*, 478 U.S. at 685 (emphasis added). Assuming the speech in this case approached the same level of lewdness as the speech in *Fraser*, M.L.'s expression was confined to an out-of-school setting, and the recipients of her speech were voluntary social media followers, not the "unsuspecting" students in *Fraser*. Defendants have not alleged that M.L. "liked"

the posts while at school, or used campus property to do so; nor have they asserted that the postings should be construed as part of the school context in any way. Thus, Defendants have not shown that M.L.'s speech was unprotected on the basis of the lewd student speech standard.

Nor have Defendants placed the expression into any other category that would permit adverse government action. There are "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468 (2010). "[T]he First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.'" *Id.* (citations omitted). Defendants are incorrect in their assertion that "vulgar" or "profane" speech is categorically unprotected by the First Amendment. Dkt. No. 11 at 3; *United States v. Hicks*, 980 F.2d 963, 970 (5th Cir. 1992); *see also Wiegland v. Seaver*, 504 F.2d 303, 306 (1974). There is no "profanity exception" to the First Amendment. *Cohen v. California,* 403 U.S. 15 (1971). "[A]s a general rule, simple profanity or vulgarity-not rising to the level of 'fighting words' or obscenity-is constitutionally protected speech." *Hicks*, 980 F.2d at 969. "[O]bscene speech— sexually explicit material that violates fundamental notions of decency—is not protected by the First Amendment." *United States v. Williams*, 553 U.S. 285 (2008). "Speech may be regulated as obscene if it meets these elements: (1) "whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (2) "whether the work

depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (3) "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 23 (1973).  The Court need not apply this test, however, because Defendants have not briefed this issue with any particularity, other than to offer cursory references to obscenity.  Dkt. No. 11 at 5, 7.  Moreover, the complaint alleges that M.L. was disciplined for ten posts—not one or two.  Even if specific posts by M.L. were obscene under the Supreme Court's standards, and could be regulated, the proper course of action for the Court would be to excise them from this case, not subject the entire lawsuit to dismissal.  *Rosario v. Clark Cty. Sch. Dist.*, No. 2:13–CV–362 JCM (PAL), 2013 WL 3679375 (D. Nev. 2013) (finding that plaintiff stated a First Amendment claim, with the exception of one Tweet excised for obscenity).

M.L. has alleged that she was engaged in non-threatening expression, outside the school environment, and that school officials punished her on the basis of that expression by removing her from a school activity.  The non-threatening, profane, off-campus speech in the record does not clearly fall into any of the three exceptions to the *Tinker* test.  Thus, by the Fifth Circuit's standards, the speech would be presumed protected absent facts to show a reasonable forecast of substantial disruption.  *Bell*, 799 F.3d at 391.  Defendants assert that they did comply with this standard, but have not alleged how at this stage.  Dkt. No. 16 at 4.  Because the pleadings do not reflect any such facts, this record does not show M.L.'s speech was categorically unprotected by the First Amendment, and she has not failed to state a

claim based on the speech's content.

Finally, Defendants assert that M.L. cannot show a violation of her First Amendment rights because she was not suspended or expelled by the school district. Dkt. No. 16 at 4. Instead, M.L. was only dismissed from one of the school's programs. According to Defendants, M.L. was therefore not deprived of a "constitutionally cognizable interest." *Id.*

For this proposition, Defendants rely on the Fifth Circuit's unpublished decision in *Doe v. Silsbee Independent School District*, 402 Fed. Appx. 852 (per curiam) (5th Cir. 2010). There, the Fifth Circuit agreed that H.S., a high school student, could be removed from the cheerleading team based on her refusal to cheer for certain players at the school basketball game. *Id.* at 855. Because H.S. was serving as a "mouthpiece" for the school district at the time of her refusal to cheer, and because her expression caused a substantial interference with the work of the school, the school was not constitutionally required to tolerate her decision to express herself at the basketball game. *Id.*

However, the Fifth Circuit did not hold that schools could always remove students from extracurricular activities on the basis of their speech, no matter the content—nor did the Fifth Circuit hold that a student's off-campus expression, outside the school environment, could always become the basis for such a removal. When the Fifth Circuit revisited the case on the issue of attorney's fees and considered whether H.S.'s claim was frivolous, it held: "Unlike H.S.'s equal protection and due process claims, *she did not fail to allege facts underlying the*

*essential elements of her First Amendment claim* . . . . Although H.S.'s free speech claim was eventually unsuccessful, we believe that her argument had at least 'some arguable merit.'" *Doe v. Silsbee Indep. Sch. Dist.*, 440 Fed. Appx. 421, 427-428 (per curiam) (5th Cir. 2011) (citation omitted) (emphasis added).  Similarly here, M.L. did not fail to allege facts underlying the essential elements of a First Amendment claim solely because the adverse government action taken against her was removal from one of the school's programs.

The Supreme Court expressly contemplated in *Tinker* that students participating in extracurricular activities must receive some degree of constitutional protection for their speech, holding:

> A student's rights, therefore, do not embrace merely the classroom hours.  When he is in the cafeteria, *or on the playing field*, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others.

*Tinker*, 393 U.S. at 512-513 (emphasis added).  *Tinker* is not explicit as to whether this protection means students have the right to speak in these activities without fear of suspension from school, or that this protection means dismissal from the activity would also be impermissible.  However, courts across the country have recognized the possibility that students may plead First Amendment claims on the basis of removal from extracurricular activities.  *See, e.g., B.L. by Levy v. Mahoney Area Sch. Dist.*, No. 3:17-CV-1734, 2017 WL 4418290, at *4 (M.D. Pa. Oct. 5, 2017) ("This Court will refuse to offer a different framework for analyzing student speech

cases where the punishment for speech involves a suspension from an extracurricular activity as opposed to a suspension or expulsion from school."); *Doninger v. Niehoff*, 642 F.3d 334, 351 (2d Cir. 2011) (denying relief to student barred from running for class secretary, but noting, "we do not conclude in any way that school administrators are immune from First Amendment scrutiny when they react to student speech by limiting students' participation in extracurricular activities."); *Lowery v. Euverard*, 497 F.3d 584, 594 (6th Cir. 2007) (holding student athletes' rights were not violated by dismissal from the football team, because their speech was reasonably likely to cause a substantial disruption—not because the students were merely removed from the team); *Seamons v. Snow*, 84 F.3d 1226, 1237-1238 (10th Cir. 1996) (concluding a student stated a First Amendment claim after being removed from the football team for his speech).

Well-established law makes clear that there is no constitutional right for a student to participate in extracurricular activities. *Doe v. Silsbee Indep. Sch. Dist.*, 402 Fed. Appx. 852, 854 (5th Cir. 2010) (per curiam). In the First Amendment context, however, "[t]he constitutional right at issue is freedom of expression, not that of participation in extracurricular activities." *T.V. ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 780 (N.D. Ind. 2011). "[T]he First Amendment prohibits . . . adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). This is an entirely separate issue from the alleged deprivation of a liberty or property interest. *See Bd. of Regents of State Colleges v. Roth*, 408

U.S. 564, 585 (1972) (distinguishing a First Amendment claim from a due process claim). The harm which avails a plaintiff of a First Amendment claim is the inability to speak, or the repercussions for doing so. Thus, "[t]hat there is no constitutional right to participate in athletics or other extracurricular activities may be pertinent to an analysis of other sorts of constitutional claims, such as a Due Process claim . . . or an Equal Protection claim, but as *Tinker* itself notes, not to a freedom of expression claim." *B.V.*, 807 F. Supp. at 780. Stated differently, "the First Amendment, unlike the Fourteenth Amendment, does not require the deprivation of an interest in 'life, liberty or property.'" *Burge ex rel. Burge v. Colton Sch. Dist.*, 53, 100 F. Supp. 3d 1057, 1076 n.2 (D. Or. 2015); *see also Peres v. Oceanside Union Free Sch. Dist.*, 426 F. Supp. 2d 15, 25 n. 2 (E.D. N.Y. 2006) ("Although a procedural due process claim under the Fourteenth Amendment requires a party to demonstrate that she was deprived of a protected property or liberty interest . . . a claim under the First Amendment has no such requirement."); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) ("The fact that Owens did not have his own liberty or property interest at stake in the litigation, as would be required for a due process claim, did not preclude his claim for violation of his first amendment rights."). M.L.'s lack of a constitutional right to cheer for the San Benito High School Cheerleading Squad does not mean that she lacked a constitutional right to free speech in her off-time.

Defendants provide a number of examples which demonstrate that students are subject to diminished constitutional protections in extracurricular activities.

*See, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). School officials do not violate the Fourth Amendment, for example, by subjecting student athletes to random drug testing. *Id.* Defendants are correct in this regard, but none of the cases cited state that these students condition their participation in extracurricular activities on a complete waiver of off-campus speech rights. To use Defendants' terminology, the "constitutionally cognizable interest" in First Amendment cases is the ability to speak freely without suffering an adverse action by state actors—M.L. pleaded facts to show this interest was jeopardized.

To be clear, school officials unquestionably have the authority to remove students from extracurricular activities on the basis of certain types of speech. If, for example, the students were engaged in lewd speech while in the school context, this may provide a basis for discipline. Or, if officials could reasonably forecast a substantial disruption to the program, the student's removal also may be appropriate. But the officials involved must adequately assert one of the constitutionally acceptable methods of regulating student speech, just as they must in any other student speech context. Here, Defendants have not done so.

At this stage, the pleadings reflect that: (1) M.L. engaged in off-campus speech via her personal social media page, (2) the speech itself was not directed toward the school environment and did not reference the school in any way, (3) the speech contained profanity and some suggestive innuendo, (4) the speech was non-threatening, (5) Defendants removed M.L. from a school program because of this expression, and (6) on this record, there were no disruptive effects to any school

activities.  M.L.'s expression does not readily fall into the three categories of speech punishable without any disruption, since the lewd speech standard has been limited by the Supreme Court to the school context.  If punishable, then, M.L.'s speech would be governed by *Tinker*, and there are no facts in the record to support a finding of disruption.  Therefore, Plaintiff has adequately pleaded facts which, if true, could state a First Amendment claim, and has satisfied her burden in overcoming the first prong of qualified immunity.

### b. Clearly established right

The Court must now turn to the question of whether the right at issue was clearly established under the second prong of the qualified immunity analysis. Because the Court concludes that it was not, Defendants are entitled to qualified immunity in their individual capacities.  It was not "beyond debate" in March 2017 that a student could state a First Amendment claim after being removed from an extracurricular activity on the facts in this record.

"A school official is entitled to immunity from civil liability arising out of her discretionary decisions unless her conduct is 'clearly established' as unconstitutional at the time of the disciplined action." *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014).  "[E]ducators are entitled to immunity unless 'no reasonable official' would have deemed the disputed conduct constitutional." *Id.* 760.  The Supreme Court has noted the "high degree of deference that courts must pay to the educator's professional judgment." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009).

The Court declines to accept Defendants' threshold argument that qualified immunity is appropriate because some of the speech at issue came in the form of social media "likes."  Qualified immunity need not be extended merely because the mode of disseminating the expression is novel, when precedent mandates that the *content* of the speech itself be a key consideration in determining whether speech rights are clearly established.  *Davison v. Loudoun Cty. Bd. of Supervisor*s, 227 F. Supp. 3d 605, 614 (E.D. Va. 2017) (citing *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). ("In short, Defendant is not entitled to qualified immunity simply because this case involves a relatively new technology.").  It is clearly established that online speech receives constitutional protection.  *Jackson*, 626 Fed. Appx. at 88.  The precise method of disseminating the online speech need not have been pinpointed by a court to provide "fair notice" to officials for qualified immunity purposes.  To conclude otherwise would eliminate constitutional protections from substantial portions of online communications, merely because the expression was disseminated through a new brand of application or platform.

What is less clear is how far the reach of school officials may extend in disciplining online speech.  The Fifth Circuit has noted First Amendment case law lacks "clear guidance" and precedent sends "inconsistent signals" on this question. *Jackson*, 626 Fed. Appx. at 89.  Yet that the law is unclear as to the limits of punishment for online speech does not mean that what *is* clearly established should be disregarded.  "While the internet may pose new challenges, it did not change the law." *Sagehorn v. Ind. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 862 (D. Minn. 2015).

It is clearly established that students have First Amendment rights on the school campus, and, to a greater extent, away from the school campus in their private lives. It is also clearly established that, to discipline students on the basis of their speech, school administrators must show the speech fell into a punishable category of speech. Officials have long had fair notice that, absent one of these reasons, student speech is presumed protected. In *Bell*, the Fifth Circuit also recognized, for the first time, that a school could punish a student for off-campus online speech, only after emphasizing the nexus between the student's speech and the school environment in the form of the student intentionally directing his threatening speech toward the school environment. *Bell*, 799 F.3d at 395. While *Bell* stopped short of adopting or rejecting a rigid test defining the scope of off-campus speech protections, its import should not be understated. *Bell* recognized that (1) student speech analysis begins by classifying the speech at issue, (2) punishable speech which does not fall into one of three exceptions is governed by *Tinker*, (3) *Tinker* can apply to off-campus speech, under longstanding Fifth Circuit precedent, and (4) "a speaker's intent matters when determining whether the off-campus speech being addressed is subject to *Tinker*." *Id.* at 391, 394, 395. All of this was clearly established in March 2017, when the facts of this case occurred.[5]

Taking these principles together, "[t]he general rule that schools may not regulate merely inappropriate out-of-school speech (as opposed to truly threatening or substantially disruptive speech) has been well-established for decades." *R.S. ex*

---

[5] Given these clearly established principles, the Court could not recommend qualified immunity be extended in its First R&R, before submission of Plaintiff's Rule 7(a) reply, when neither party had submitted factual allegations as to the actual content of the speech at issue.

*rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1140 (D. Minn. 2012) (citing *Morse*, 551 U.S. at 405, and *Fraser*, 478 U.S. at 688); *see also Sagehorn*, 122 F. Supp. 3d at 862 ("The law is sufficiently clear that on facts such as the complaint alleges in this case—a student using personal property to make non-threatening speech off-campus, that in no way impacts or disrupts the school environment—a student would have a clearly established right to free speech."); *B.L. by Levy v. Mahoney Area Sch. Dist.*, 289 F. Supp. 3d 607, 613 (M.D. Pa. 2017) ("Simply put, the ability of a school to punish lewd or profane speech disappears once a student exits the school grounds").  The Fifth Circuit has long weighed the *disruptive* effects of off-campus student speech containing profanity.  *Sullivan v. Hou. Ind. Sch. Dist.*, 475 F.2d 1071 (5th Cir. 1973) (applying *Tinker* to off-campus speech that contained profanity, stating: "This case arises from the unauthorized distribution of an underground newspaper near a high school campus, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other."); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608 n.40 (citing *Sullivan* as "applying *Tinker* and finding that student newspaper published off-campus did not substantially disrupt school activities"); *Bell*, 799 F.3d at 394 (collecting cases citing *Sullivan* as applying *Tinker* to off-campus speech).  This precedent has placed officials on notice that profane, off-campus speech, when punishable, is subject to the *Tinker* standard.  That the form of speech at issue in these cases has changed from underground newspapers to

Twitter communications does not alter clearly established law, since "there is no need that the 'very action in question have previously been held unlawful." *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364 (2009) (citation omitted).

More problematic for Plaintiff, however, is the lack of clarity in the law on students' removal from extracurricular activities. "T]he Supreme Court has observed that, even if a particular legal doctrine is clearly established, "[i]t is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts." *Porter*, 393 F.3d at 620 (citation omitted). Nothing in the Supreme Court's precedent limits the right to student speech to cases of certain types of discipline. In *Jackson v. Ladner*, however, the Fifth Circuit extended qualified immunity to cheerleading coaches and paused to note during its analysis that "the undisputed summary-judgment evidence shows that M.J. was not suspended *from school* on the basis of her speech but rather suspended from her participation on the cheer squad." 626 Fed. Appx. at 89 (emphasis in original). *Jackson* did not hold that this type of discipline meant the plaintiff was unable to state a claim, and, as such, the Court maintains its determination that Plaintiff was not precluded from doing so in this case. *See also Doe v. Silsbee Indep. Sch. Dist.*, 440 Fed. Appx. 421, 427-428 (per curiam) (5th Cir. 2011) (noting cheerleader did not fail to allege the underlying elements of a First Amendment claim). But the Court cannot fairly say that this language would have made it clear to "every reasonable school official" that extracurricular discipline for off-campus profanity implicates the same level of constitutional protections as other

forms of discipline.  Nor is there a "robust consensus of authority" which would have placed these questions "beyond debate."  In one 2017 decision, a court granted injunctive relief to a high school student who was removed from the cheerleading team on the basis of her off-campus, online profanity.  *B.L. by Levy v. Mahoney Area Sch. Dist.*, 289 F. Supp. 3d 607 (M.D. Pa. 2017).  Within a year, another court reached the opposite conclusion.  *Johnson v. Cache Cty. Sch. Dist.*, --- F. Supp.3d ---, No. 1:18CV57DAK, 2018 WL 3242298, at *12 (D. Utah Jul. 3, 2018).  As that court wrote:

> This case raises very interesting First Amendment issues for our social media age. It does not fit squarely within any of the student speech cases that have made their way to the Tenth Circuit or Supreme Court.  Are there students across the country using profanity on social media?  Yes.  Are some of those students cheerleaders?  Yes. Do those cheerleaders have the absolute right to remain on the cheer squad without consequences for such posts when they are sent to other students at the school?  This court cannot answer that question clearly and unequivocally yes, especially in the factual scenario in which S.J. made her post.

*Id.*  Given the conflicts in this area of the law, the Court is unable to conclude that "no reasonable official" would have deemed Defendants' conduct constitutional.  It was not "beyond debate" in March 2017 that Defendants could violate clearly established law by removing a student from a high school cheerleading team for online profanity or suggestive speech, particularly where (1) the student and her mother had agreed in writing that her social media page would be subject to the reach of the Cheerleading Constitution, and (2) the biography section of M.L.'s Twitter profile identified her as part of "San Benito Varsity Cheer."  Dkt. No. 1 at 4; Dkt. No. 27-2 at 1.  At a minimum, reasonable school officials could have debated

whether these facts created a sufficient basis to allow M.L.'s removal from the team. For these reasons, Plaintiff has not overcome the second prong of the qualified immunity defense, and her First Amendment claims against the individual defendants should be dismissed.

### 2. Claim against the school district

In addition to the individual school officials, Plaintiff seeks to hold SBCISD liable for M.L.'s alleged harm.   Dkt. No. 1 at 3.   Municipalities may only be considered "persons" for purposes of a § 1983 claim under limited circumstances. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978).   A municipality may not be held liable on a *respondeat superior* basis; merely employing a tortfeasor cannot subject the municipality to liability.   *Jett v. Dallas Ind. Sch. Dist.*, 7 F.3d 1241, 1244 (5th Cir. 1993).   "Rather, it is liable for the unconstitutional conduct of its policymakers, including persons to whom it has delegated policymaking authority in certain areas."   *Barrow v. Greenville Ind. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007).   To state a claim against a municipality, a plaintiff must establish three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Only a policymaker with "final policymaking authority" may subject a municipality to liability.   *City of St. Louis v. Prapotnik*, 485 U.S. 112, 123 (1988). The identity of the final policymaker is a question of state law.   *Id.*   Under Texas law, for example, the final policymaking authority in an independent school district

is the board of trustees.  *See* TEX. EDUC. CODE §11.151 ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district."); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 413 (5th Cir. 2015).  To defeat a Rule 12(b)(6) motion, a plaintiff need not pinpoint the legal identity of the policymaker, but must nevertheless plead facts to show "that the statutorily authorized policymaker promulgated an unconstitutional policy." *Groden v. City of Dallas*, 826 F.3d 280, 285 (5th Cir. 2016).  An entity with final policymaking authority may delegate its authority to make final policy, but "courts must be sensitive to the distinction between decisionmakers and final policymakers." *Arevalo v. City of Farmers Branch*, No. 3:16-CV-1540-D, 2017 WL 5569841, at *5 (N.D. Tex. Nov. 20, 2017).

> [A final policymaking authority] can delegate policymaking power by an express statement, job description, or other formal action.  Or, it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role.  In essence, the governing body must expressly or impliedly acknowledge that the agent acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent.

*Id.* (citations omitted).  Thus, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered . . . The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) (citations omitted).  "The act must be by a final decisionmaker who also is the policymaker, unconstrained by policies imposed from a higher authority." *Hampton Co. Nat.*

*Sur., LLC v. Tunica Cty.*, 543 F.3d 221, 227 (5th Cir. 2008). Even an official "whose discretionary decisions on a particular matter are final and unreviewable . . . is constrained if another entity has ultimate power to guide that discretion, at least prescriptively, whether or not that power is exercised." *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 382 (5th Cir. 2007).

An official policy is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority," or a "persistent, widespread practice of [municipal] officials or employees . . . that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). "Actual or constructive knowledge of the policy must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority." *Scherff v. South Texas College*, No. 7:16-CV-658, 2017 WL 3783042, at *13 (S.D. Tex. Aug. 29, 2017). "The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010).

Here, in her reply brief, Plaintiff alleges that the Cheerleading Constitution was the official policy that served as the moving force for her harm. Dkt. No. 15 at 9. In order for M.L. to participate in the cheerleading program, she and her mother were both required to sign the constitution, which "set standards for acceptable behavior for cheerleaders on the squad as well as rules and regulations governing

the cheerleaders." Dkt. No. 1 at 4; Dkt. No. 15 at 9. M.L. was dismissed from the program pursuant to Section 11.2 of the constitution, which provides: "11.2 TWO DEMERIT INFRACTIONS. *Members who post items on social media containing inappropriate material including acronyms.*" *Id.* (emphasis in original). Plaintiff briefly alleges that the policy was "adopted by the district," and that the policy is "distributed by the school district to cheerleader applicants," but does not provide specific facts to tie the Cheerleading Constitution to the district's board of trustees, or allege who promulgated the policy. Dkt. No. 1 at 9-10; *see Wright v. Denison Indep. Sch. Dist.*, No. 4:16-CV-615, 2017 WL 226778, at *4-5 (E.D. Tex. May 24, 2017) (rejecting "boilerplate assertions" of the grounds for municipal liability as insufficient under current pleading standards). Instead, she asserts that Defendant Sanchez was the final policymaker for whose conduct SBCISD can be held liable, because his enforcement of the Cheerleading Constitution, and M.L.'s dismissal, could not be appealed to the superintendent or school board. *Id.* at 10. Under district policy, "any determination made by a campus principal concerning student compliance with campus or District team rules or the constitution governing an extracurricular activity shall be final at Level One and may not be appealed to Level Two or Level Three." *Id.*

Taking Plaintiff's allegations as true, SBCISD policy delegates some type of authority to Sanchez—but the dispositive question is the nature of the authority. Plaintiff asserts that the authority is to make final policy over the enforcement of extracurricular activity constitutions, while Defendants maintain that the authority

is only to act as a final decision-maker.  The Court agrees with Defendants that Sanchez acted as a final decision-maker, but not as a final policymaking authority who could bind the school district for his allegedly unconstitutional actions.

In *Jett v. Dallas Independent School District*, the Fifth Circuit examined a case where a plaintiff teacher asserted the board of trustees had delegated final policymaking authority over employee transfers to the superintendent.  7 F.3d 1241, 1246 (5th Cir. 1993).  A policy adopted by the board granted the superintendent unreviewable, final decision-making authority over employee transfers.  *Id.* at 1246 n.9.  The Fifth Circuit held "that Superintendent Wright may have been delegated the final decision in the cases of protested individual employee transfers does not mean that he had or had been delegated the status of policymaker, much less final policymaker, respecting employee transfers."  *Id.* at 1246.  Despite the policy granting the superintendent final decision-making power, no policy "purported to grant Superintendent Wright *policymaking* authority respecting employee transfers."  *Id.* at 1249 (emphasis added).  Thus, an official who is delegated unreviewable decision-making authority does not automatically also wield authority to set final policy.  *Barrow*, 480 F.3d at 382; *see also Butler v. Craft*, No. 1:16-CV-01158, 2017 WL 1366897, at *4 (W.D. La. Apr. 11, 2017) ("[N]either finality nor reviewability necessarily determine whether an official is the final policymaker as to a particular issue.").  Instead, courts look to the relevant statutory framework, as well as whether there has been an express or implicit acknowledgment "that the agent acts in lieu of the governing body to set goals and to structure and design the

area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent." *Arevalo*, 2017 WL 5569841, at *5.

Plaintiff invokes *Eugene v. Alief Independent School District*, where the Fifth Circuit held that a principal was not a final policymaker, and attempts to distinguish the case by asserting that she, unlike the *Eugene* plaintiff, has at least created a fact question as to whether Sanchez was delegated final policymaking authority. 65 F.3d 1299, 1304 (5th Cir. 1995). But the Court finds *Eugene* to be in line with the present set of facts. As in this case, the plaintiff in *Eugene* asserted that the school principal had been delegated authority to make final, unreviewable decisions. *Id.* at 1304. According to the Fifth Circuit, this delegation invested final decision-making authority in the principal, but not authority to set final policy. *Id.* at 1304-05.

Similarly here, Sanchez had the authority to make final decisions as to enforcement of extracurricular constitutions, but Plaintiff does not plead facts to show that the school board expressly granted him authority to create final policy for the school district. "[S]chool boards do not delegate policymaking authority when they give 'complete discretion' to principals or superintendents over a particular area." *Yara v. Perryton Ind. Sch. Dist.*, No. 2-12-CV-117-J, 2013 WL 1497049, at *4 (N.D. Tex. Apr. 10, 2013); *see also Shelton v. Bonham Indep. Sch. Dist.*, No. 4:17-CV-00764, 2018 WL 2236924, at *4 (E.D. Tex. May 16, 2018) ("While Wakefield may have had decision-making authority, such authority is distinguishable from final

policymaking authority.").  Even in making unreviewable decisions, Sanchez was still bound by all other policies and guidelines established by the school district. *Eugene*, 65 F.3d at 1304; *Barrow*, 480 F.3d at 382 ("In *Auriemma v. Rice*, cited by *Jett*, the Seventh Circuit concluded that the Chicago Police Chief, who by city ordinance had unreviewable discretion to make personnel decisions, would not have set city policy in allegedly discriminating by race. Rather, the Chief would have *violated* city policy, embodied in another city council ordinance generally forbidding racial discrimination in hiring.") (emphasis in original).

Both Texas statute and case law mandate that the final policymaker for an independent school district is the board of trustees, and Plaintiff has not alleged how either state or local law permitted Sanchez to set final policy on the district's behalf.  As Plaintiff acknowledges, "the school principal, Defendant Sanchez, has been delegated the final *decision-making* authority with respect to the enforcement of the cheerleading constitution."  Dkt. No. 15 at 10 (emphasis added).  While Plaintiff identifies a local policy speaking to Sanchez's decision-making authority, the Fifth Circuit's precedent differentiates between final decision-making and final policymaking authority.  *Jett*, 7 F.3d at 1246.  Plaintiff's complaint, therefore, fails to state a claim against SBCISD for Sanchez's enforcement of the Cheerleading Constitution.  *Cf. Teague ex rel. C.R.T. v. Texas City Ind. Sch. Dist.*, 386 F. Supp. 2d 893, 896-97 (S.D. Tex. 2005) ("Defendant cannot . . .  be held liable for any 'policy' developed by those [non-policymaking] actors.").

### 3. Claim against defendants in official capacities

Plaintiff seeks to recover against the school official defendants in both their individual and official capacities. "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which . . . a local government would be suable in its own name." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). Said another way, "official capacity suits are really suits against the governmental entity," and an official capacity suit will be "subsumed" within an identical municipal liability claim. *Goodman v. Harris Cty.*, 571 F.3d 388, 396 (5th Cir. 2009). Because Plaintiff fails to state a claim against SBCISD, she also fails to state a claim against Sanchez, Vega, Camacho-Garza and Garcia in their official capacities. Her official capacity suits should be dismissed.

### C. Fifth Amendment Claim

Plaintiff also asserts that Defendants violated M.L.'s rights under the Fifth Amendment. Dkt. No. 1 at 8. She provides no additional explanation for this claim. "Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth." *Malloy v. Hogan*, 378 U.S. 1, 26 (1964). Thus, "the Fifth Amendment applies only to the actions of the federal government, and not to the actions of a municipal government as in the present case." *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996). Plaintiff does not allege that Defendants were federal actors. On the

contrary, she concedes that the school district is a political subdivision of Texas. Dkt. No. 1 at 3. She also appears to abandon the claim in her reply brief, and does not challenge Defendants' argument for dismissal. Therefore, Plaintiff's Fifth Amendment claim should be dismissed.

### D. Fourteenth Amendment Claims

Finally, Plaintiff alleges that Defendants violated her "Fourteenth Amendment Rights, due process, life and liberty right, and equal protection by dismissing her from the San Benito Varsity Cheerleading Squad." Dkt. No. 1 at 8.

#### 1. Due Process

Under the Fourteenth Amendment, state actors may not deprive "any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV. "The first inquiry in every due process challenge—whether procedural or substantive—is whether the plaintiff has been deprived of a protected interest in property or liberty." *Edionwe v. Bailey*, 860 F.3d 287, 292 (5th Cir. 2017). Further, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972).

Here, Plaintiff alleges that Defendants deprived M.L. of her protected interest in being a member of her high school's cheerleading team. She asserts that "[b]eing a cheerleader invests a person with liberty and property rights," as student cheerleaders may receive scholarships, they may travel with meals and lodging, and they are afforded "standing in the community, privilege of attending cheerleading

camps, even internationally, health and exercise benefits." Dkt. No. 1 at 2. As Defendants emphasize, however, students "do not possess a constitutionally protected interest in their participation in extracurricular activities." *Doe v. Silsbee Ind. Sch. Dist.*, 402 Fed. Appx. 852, 854 (5th Cir. 2010) (citing *NCAA v. Yeo*, 171 S.W.3d 863, 865 (Tex. 2005)). The Fifth Circuit has rejected attempts to classify extracurricular activities as protected interests implicating the safeguards of due process. *Niles v. Univ. Interscholastic League*, 715 F.2d 1027, 1031 (5th Cir. 1983); *see also Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 765 (S.D. Tex. 2008). Therefore, Plaintiff has not stated a claim for a violation of due process.

### 2. Equal Protection

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). An individual plaintiff may bring an equal protection claim by showing "(1) he or she was treated differently from others similarly situated, and (2) there was no rational basis for the treatment." *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007). But "if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Mahone v. Addicks Util. Dist. of Harris Cty.*, 836 F.2d 921, 932 (5th Cir. 1988).

Plaintiff has not alleged that M.L. was treated differently from any other similarly situated persons. She also does not appear to contest Defendants' argument that her equal protection claim should be dismissed. The Fifth Circuit has previously held dismissal to be proper where plaintiffs' "equal-protection claim 'amounts to no more than a restatement of [their F]irst [A]mendment claim.'" *Williams v. Riley*, 275 Fed. Appx. 385, 390 (5th Cir. 2008) (per curiam) (quoting *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990)). Similarly here, Plaintiff's equal protection claim should be dismissed under Rule 12(b)(6).

### E. Additional Claims

In her reply brief, Plaintiff also alleges that the Cheerleading Constitution is "unconstitutionally vague" and "overly broad" so as to chill students' off-campus speech. Dkt. No. 15 at 13. While Plaintiff's complaint noted that she made similar allegations to the school principal, the complaint itself did not seek to raise these grounds as claims for relief in federal court. A plaintiff generally may not add new claims in a response brief. *Reyes v. Wells Fargo Bank, N.A.*, No. 3:15-CV-01348-L, 2016 WL 6915269, at *6 (N.D. Tex. Oct. 16, 2016). The period during which Plaintiff could amend her complaint as a matter of course has elapsed. FED. R. CIV. P. 15. As no amended complaint or motion for leave to file an amended complaint has been submitted, the Court need only consider Plaintiff's claims as set out in her original complaint and defended in her reply brief. However, even assuming Plaintiff's complaint could be construed to raise these issues, neither would survive Defendants' 12(b)(6) Motion.

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224-25 (5th Cir. 2009).  The standard is heightened in the school context.  "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986).  Most importantly for this case, a void for vagueness challenge is, ultimately, a due process claim. *Cash*, 585 F.3d at 225.  Unlike a First Amendment claim, the vagueness doctrine may only be invoked in the school context where students "faced a potential deprivation of their *property* interests in attending a public school." *Chalifoux v. New Caney Ind. Sch. Dist.*, 976 F. Supp. 659, 668 (S.D. Tex. 1997) (emphasis added).  Because M.L. did not have a protected property interest in her position on the cheerleading squad, and never faced a deprivation of her interest in attending a public school, she would not have been able to raise a vagueness challenge to the Cheerleading Constitution.

Plaintiff's overbreadth claim would also be meritless.  The overbreadth doctrine provides that "a broadly-written statute may have such a deterrent effect on free expression that it should be subject to a facial challenge even by a party whose own conduct may be unprotected." *Int'l Soc. for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 500 (5th Cir. 1989).  "A

regulation is constitutionally overbroad if it (1) prohibits a substantial amount of constitutionally-protected freedoms, when judged in retaliation to the regulation's 'plainly legitimate sweep,' and (2) is not susceptible to a limiting construction that avoids constitutional problems." *Chalifoux*, 976 F. Supp. at 670.  But critically, "[t]he overbreadth doctrine enables a plaintiff to challenge a statute where it infringes on third parties who are not parties to the action."  *Id.* (emphasis in original).  Courts "generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 n.6 (2008).  And, "an overbreadth challenge is not appropriate if the first amendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties." *United States v. Petras*, 879 F.3d 155, 167 (5th Cir. 2018) (citation omitted); *see Chalifoux*, 976 F. Supp. at 760 (rejecting overbreadth claim against school policy where students also raised substantive challenge as applied to their own First Amendment rights).  The First Amendment rights asserted by Plaintiff in this case are "essentially coterminous" with the expressive rights of third parties, and Plaintiff has not alleged that the rights of third parties would be threatened in a manner different from the alleged threat to M.L.'s rights.  Her reply brief only contains general statements of the law on overbreadth challenges, and assertions about the "chilling effect" of the policy untethered to well-pleaded facts which could survive a Rule 12(b)(6) motion.  *See, e.g., Jenkins v. Miller*, No. 2:12–cv–184, 2017 WL 4402431 (D. Va. Sept. 29, 2017)

(dismissing overbreadth claim upon Rule 12(b)(6) motion).  Thus, an overbreadth claim would not be appropriate even if Plaintiff had asserted one in her complaint.

## IV. Recommendation

For the reasons stated above, it is recommended that Defendants' 12(b)(1) Motion to Dismiss be **DENIED** and Defendants' 12(b)(6) Motion to Dismiss be **GRANTED**.

## V. Notice to Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

Signed on this 31st day of July, 2018.

**Ignacio Torteya, III**
**United States Magistrate Judge**